UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                     Court File No. 17-cr-182 (JNE/LIB)

       Plaintiff,

v.                                                                    **REPORT AND RECOMMENDATION**
                                                                          **AND ORDER**

Arthur Dale Senty-Haugen,

       Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1, and upon Defendant Arthur Dale Senty-Haugen's ("Defendant") Motion to Suppress, [Docket No. 24].[1] On October 5, 2017, a hearing was held regarding the parties' pretrial motions.[2] At the motions hearing, the parties requested the opportunity to submit supplemental briefing which was completed on October 26, 2017, and Defendant's Motion to Suppress, [Docket No. 24], was then taken under advisement at that time. Also on October 26, 2017, Defendant filed a Motion for Leave to File Additional Documents, [Docket No. 37], and the Government filed its Motion to Strike Pro Se Filings. [Docket No. 38]. Thereafter, the Court informed the parties that it would take all the parties motions under advisements on October 26, 2017. (Text Only Entry [Docket No. 39]).

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress, [Docket No. 24], be **DENIED**. The Court also **DENIES as moot** Defendant's Motion

---

[1] On September 28, 2017, Defendant's counsel filed a Letter, [Docket No. 30], supplementing Defendant's Motion to Suppress, [Docket No. 24], and raising pro se arguments on Defendant's behalf. Accordingly, the Court considers Defendant's Motion to Suppress, [Docket No. 24], as supplemented by Defendant's counsel's Letter. [Docket No. 30].
[2] The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 35].

for Leave to File Additional Documents, [Docket No. 37], as well as, the Government's Motion

to Strike Pro Se Filings. [Docket No. 38].

## I.    BACKGROUND AND STATEMENT OF RELEVANT FACTS

### A.  Background

Defendant is charged with one (1) count of conspiracy to defraud the United States, in

violation of 18 U.S.C. § 286, and four (4) counts of false claims, in violation of 18 U.S.C. §§ 287

and 2. (Indictment [Docket No. 1]).

### B.  Relevant Facts[3]

The record presently before the Court indicates that in January 2012, Minnesota Sex

Offender Program ("MSOP") Special Investigator Thane Murphy ("SI Murphy") was randomly

monitoring recorded phone calls from clients when he heard a call Defendant[4] had placed that

"didn't sound right." (October 5, 2017, Motions Hearing, Digital Recording at 11:37–11:39

a.m.).[5] SI Murphy then began specifically listening to Defendant's phone calls when he

monitored phone calls. (Id. at 12:41–12:46 p.m.).

Through a series of monitored phone calls, SI Murphy heard Defendant instruct a third

party to do online banking, as well as, instruct that third party to set up and check various email

accounts. (Id.). These online bank accounts, as well as, the various email addresses discussed

included the names and social security numbers of other clients within the MSOP. (Id. at 11:37–

11:39 a.m., 12:13–12:15 p.m.). Upon listening to the phone calls and hearing Defendant discuss

the names and social security numbers of other MSOP clients, SI Murphy became suspicious that

---

[3] These relevant facts are derived from the testimony of Minnesota Sex Offender Program Special Investigator Thane Murphy ("SI Murphy") and Minnesota Sex Offender Program Security Director Steven Sayovitz ("SD Sayovitz") at the October 5, 2017, motions hearing, as well as, the exhibits presented in the present case.

[4] In 1996, Defendant was indefinitely committed to the MSOP as a sexual psychopathic personality and sexual dangerous person. See, Senty-Haugen v. Goodno, 462 F.3d 846, 879 (8th Cir. 2006).

[5] SI Murphy testified that when he randomly monitored phone calls it meant he logged into the recorded phone call database, looked at all the calls made that day, and then randomly selected some of the calls to listen to. (Id. at 12:39–12:41 p.m.).

criminal activity was afoot. (Id. at 11:38–11:40 a.m.). SI Murphy continued to monitor Defendant's phone calls, and he wrote an incident report regarding each suspicious call. (Id. at 11:39–11:40 a.m.).

SI Murphy thereafter requested a history of Defendant through the incident report database. (Id. at 11:40–11:41 a.m.). That history revealed that in 2010 another Special Investigator requested that SI Murphy and his then-partner search Defendant's room for financial reports related to a mail fraud investigation at that time. (Id. at 11:40–11:42 a.m., 12:18–12:20 p.m.). However, SI Murphy testified that the 2010 search was unrelated to the investigation which is the subject of the present motion. (Id.).

SI Murphy then continued to monitor Defendant's phone calls and create incident reports because he was not sure who all was involved in the suspicious conduct. (Id. at 11:46–11:47 a.m.). During this continued monitoring, SI Murphy heard Defendant instruct another third party to go online to complete tax forms again using other clients names and social security numbers, to check various email accounts under other clients' names, and to order merchandise online to be sent to the MSOP at Moose Lake. (Id. at 11:43–11:46 a.m., 12:13–12:15 p.m.). Defendant also instruct the third party to check the account balances on various banks accounts under the names of other clients by giving the third party the different names and all the identifying information for other clients at the MSOP. (Id.). During the phone calls, SI Murphy would also hear the Defendant and the third party refer to individuals by a numbered system and read numerical values correlating to those numbers.

As part of his continued investigation, SI Murphy also obtained a digital copy of Defendant's client network materials to search for anything related to false taxes being filed. (Id.

at 12:01–12:06 p.m.).[6] In this search of Defendant's client network, SI Murphy discovered a spreadsheet with clients' initials and a list of numerical values on it, as well as, tax forms with other clients' names on the forms. (Id. at 12:10–12:14 p.m.). SI Murphy testified at the motions hearing that this spreadsheet matched the numbers he had heard the Defendant and the third party referring to in various phone calls. (Id.).

On April 16, 2013, after SI Murphy had continued to monitor Defendant's phone calls and reviewed his incident report history, SI Murphy asked the Officer of the Day to search Defendant's room to look for tax forms, address books, financial information, or anything financially suspicious that might help SI Murphy collect addition materials for his investigation. (Id. at 11:41–11:43 a.m., 12:13–12:15 p.m.). As a result of that room search, officers seized tax and financial related paperwork, including a hard copy of the spreadsheet SI Murphy discovered on Defendant's client network, as well as, an address book. (Id. at 12:15–12:16 p.m.).

SI Murphy also—with the approval of his supervisors—monitored Defendant's mail going in and out of the MSOP except for Defendant's legal mail. (Id. at 12:18–12:22 p.m.). Upon SI Murphy's request, the mail room at the MSOP began specifically monitoring Defendant's ingoing and outgoing non-legal mail. (Id.).[7] SI Murphy testified at the motions hearing that he only remembered one or two pieces of mail belonging to Defendant being brought to SI Murphy's attention while Defendant's mail was being monitored. (Id. at 12:22–12:24 p.m.).

---

[6] Clients at the MSOP have access to the client computer network which is an internal MSOP only computer network allowing the clients to use the computer without having any access to the outside internet. (Id. at 12:00–12:11 p.m.).

[7] If the mail room found anything that needed to be brought to SI Murphy's attention, the mail room would secure it, put it in an evidence bag, write an incident report, and put the evidence bag into a locker until SI Murphy could retrieve it. (Id. at 12:21–12:24 p.m.).

Regarding the above investigation, SI Murphy created two Investigation Reports: Investigation Report 2012-0291 and Investigation Report 2012-0356. (Def.'s Ex. 6, 7).[8] SI Murphy testified that he created two reports because, after he completed his first report, Defendant began communicating with a second third party in the same manner he had been communicating with the original third party. (October 5, 2017, Motions Hearing, Digital Recording at 11:46–11:48 a.m.). In January 2014, SI Murphy turned his Investigation Reports, including all of his findings, over to Brian Belich, an investigator at the Internal Revenue Service. (Id. at 12:24–12:26 p.m.). SI Murphy continued to monitor Defendant after he provided his reports to the Internal Revenue Service. (Id.).

## II.    DEFENDANT'S MOTION TO SUPPRESS. [DOCKET NO. 24].

Defendant moves this Court for an Order suppressing any evidence obtained as a result of any warrantless search of his phone calls, mail, computer network, and room after he became the suspect of suspicious criminal activity. (Def.'s Mot. to Suppress [Docket No. 24]).[9]

Defendant argues that "[t]he warrantless searches and seizures of [Defendant's] property and communications after he became the focus of an investigation were an unconstitutional violation of his right to be free from unreasonable searches and searches under the state and federal constitutions." (Def. Mem., [Docket No. 36], at 6). Defendant reasons that "the Minnesota Patient's Bill of Rights is a declaration of the understanding of patients' retention of civil liberties that are recognized and permitted by society and is a source of a reasonable expectation of privacy under the Minnesota and federal constitutions." (Id. at 7).

---

[8] Defense Exhibit 6 is Investigation Report 2012-0291, and Defense Exhibit 7 is Investigation Report 2012-0356. At the motions hearing, Defense counsel offered Defense Exhibit 6 and 7, and those Exhibits were admitted by the Court. (October 5, 2017, Motions Hearing, Digital Recording at 12:28–12:33 p.m.).

[9] Defendant challenges later subpoenas and seizures based solely on the "fruit of the poison tree" doctrine stemming from his argument that the warrantless searched violated his Fourth Amendment rights, and information gained by those violations directly lead to the subsequently obtained subpoenas. (October 5, 2017, Motions Hearing, Digital Recording at 1:01–1:02 p.m.; see, Def. Mem. [Docket No. 36]).

Defendant also submitted a pro se memorandum in which his only constitutional argument unique from that of his legal counsel is that he was in the first instance unlawfully detained at the MSOP, and therefore, according to Defendant, he retains the Fourth Amendment right and protections of a private citizen. (Pro Se Mem., [Docket No. 36-1], at 1–9).[10]

The Court takes each of these arguments in turn.

## A. Defendant's Pro Se Argument

Defendant's pro se memorandum specifically argues that "Defendant has been unlawfully detained by MSOP since January 6, 2009," and therefore SI Murphy "did not have legal jurisdiction to conduct searches of the Defendant's phone, mail and/or computers without first obtaining search warrants or subpoenas." (Id. at 8–9). This argument is based on Defendant's assertion that he "had all the rights afforded to a private United States citizen." (Id. at 9).

In his argument, Defendant acknowledges that on April 1, 1996, he was committed to the MSOP as a sexually psychopathic person and sexually dangerous person for an indeterminate period of time. (Id. at 1).

Defendant further acknowledges that in November 2004, he "was indicted by a grand jury on federal charges and eventually pled guilty to five counts of aiding and abetting false claims and one count of conspiracy to defraud the government in connection with a tax fraud scheme, and was sentenced to 57 months' imprisonment in a federal facility." Senty-Haugen v. Ludeman, 10-cv-3073 (ADM/FLN), Docket No. 15 at 2 (D. Minn. June 8, 2011); (Pro Se Mem., [Docket No. 36-1], at 2). Thereafter, Defendant was transferred from the MSOP to federal custody.

---

[10] In his pro se memorandum, Defendant also argues that "MSOP investigators do not have the statutory authority to conduct felony level criminal investigations and that the policies developed by MSOP supersede the language of" certain Minnesota statutes. (Pro Se Mem., [Docket No. 36-1], at 9). However, Defendant's assertion appears to be that SI Murphy's conduct is either criminal or in violation of certain civil statutes; Defendant does not argue a separate constitution violation based on these assertions. (See, Id.).

Defendant argues that the MSOP voluntarily relinquished jurisdiction over him when he was transferred into federal custody, and therefore, Defendant argues, the MSOP "did not have the legal jurisdiction to take custody [of Defendant] after the Defendant [was] discharged from his federal sentence." (Id. at 3–4). Essentially, Defendant argues that upon his discharge from federal custody he was a private citizen, and therefore, the MSOP unlawfully took custody of him upon his return to the MSOP. (Id.).

However, as Defendant must concede, he has already presented this argument to the Court in Senty-Haugen v. Ludeman, 10-cv-3073 (ADM/FLN) (D. Minn.), and the Court rejected Defendant's argument. In fact, Defendant not only acknowledges his prior presentation of this argument challenging his underling commitment, he quotes the Court's previous Order at length. (See, Pro Se Mem., [Docket No. 36-1], at 5).

When Defendant previously challenged his underlying civil commitment raising the same arguments as he again raises here, the Honorable Ann D. Montgomery, United States District Court Judge for the District of Minnesota, held that Defendant's claim was procedurally defaulted and that "[e]ven assuming that cause exist[ed] to excuse [Defendant's] procedural default, his claim fails on the merits." Senty-Haugen v. Ludeman, 10-cv-3073 (ADM/FLN), Order [Docket No. 15], at 3 (D. Minn. June 8, 2011). Judge Montgomery reasoned that as Defendant was committed to the MSOP indefinitely, and as the MSOP was the first to obtain custody of Defendant, it had primary jurisdiction over him indefinitely. (Id. at 3–4). Judge Montgomery concluded that Defendant "was, in effect, temporarily removed or 'on loan' from the primary jurisdiction of the MSOP pursuant to the federal writ," and that "[o]nce [Defendant's] federal sentence was completed, he was properly returned to the custody of the MSOP to carry out an indefinite sentence." (Id. at 4). Accordingly, Judge Montgomery denied

Defendant's Petitioner for a Writ of Habeas Corpus. Judge Montgomery also declined to grant Defendant a certificate of appealability.

Although Defendant attempts to here again raise the argument he present to Judge Montgomery and challenge her holding as in err, this is not the proper forum for such a challenge. Judge Montgomery has already held that Defendant is lawfully committed to the MSOP; he cannot again challenge that commitment on the same grounds presented to Judge Montgomery. Defendant's avenue to a remedy, if any, is to the Eighth Circuit Court of Appeals, not a collateral attack with this Court.[11]

### B. Defendant's Fourth Amendment Based Arguments

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV.

However, "[a]n individual asserting Fourth Amendment rights 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable.'" United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (citing Minnesota v. Carter, 525 U.S. 83, 88 (1998)); Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). In any Fourth Amendment challenge, the Court must first determine whether a justifiable expectation of privacy is at issue; stated differently, the Court must determine whether the defendant challenger invoking the protection of the Fourth Amendment can claim a legitimate expectation of privacy that has been invaded by government action. See, e.g., Smith v. Maryland, 442 U.S. 735, 740

---

[11] Alternatively, this Court need not even consider Defendant's pro se arguments because those arguments were submitted pro se while Defendant was represented by counsel. (See, e.g., Defendant's Pro Se Supplemental Memorandum in Support of Motion to Suppress [Docket No. 36-1]) (emphasis added). As long as Defendant is represented by legal counsel, Defendant must speak to the Court through that counsel, and the Court will not accept pro se filings from Defendant. See e.g., United States v. Agofsky, 20 F.3d 866, 872 (8th Cir. 1994) ("There is no constitutional or statutory right to simultaneously proceed pro se and with benefit of counsel.").

(1979). The defendant bears the burden of proving a reasonable expectation of privacy in the area searched. Rakas, 439 U.S. at 130–31. To establish a legitimate expectation of privacy, the defendant must show a subjective expectation of privacy and that his expectation of privacy is one that society is prepared to recognize as objectively reasonable. See, United States v. Mathias, 721 F.3d 952, 957 (8th Cir. 2013) ("The question of whether a person has a constitutionally protected reasonable expectation of privacy in an area requires us to ask (1) whether the individual manifested a subjective expectation of privacy in the area; and (2) whether society is willing to recognize the expectation as reasonable.") (citing California v. Ciraolo, 476 U.S. 207, 211 (1986)). Stated differently, "the State's intrusion into a particular area . . . cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" New York v. Class, 475 U.S. 106, 112 (1986) (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).

Important to the present case, the Eighth Circuit Court of Appeals has held that involuntarily civilly committed person, such as Defendant, "retain the Fourth Amendment right to be free from unreasonable searches that is analogous to the right retained by pretrial detainees." Beaulieu v. Ludeman, 690 F.3d 1017, 1028 (8th Cir. 2012); Serna v. Goodno, 567 F.3d 944, 948–49 (8th Cir. 2009). "Although the expectation of privacy shared by involuntarily civilly committed persons and pretrial detainees is of a 'diminished scope,' neither [the Eighth Circuit Court of Appeals] nor the Supreme Court has ever outlined exactly what expectation of privacy these persons reasonably have," except the Eighth Circuit Court of Appeals has held "that detainees do not have a reasonable expectation of privacy in their jail cells" but do have a "reasonable expectation of privacy in a single-person bathroom when there is no immediate indication that it is being used for purposes other than those ordinarily associated with bathroom

9

facilities." Arnzen v. Palmer, 713 F.3d 369, 373 (8th Cir. 2013) (citing Bell v. Wolfish, 441 U.S. 520, 559 (1979); Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 658 (1995); United States v. Hogan, 539 F.3d 916, 923 (8th Cir. 2008)).

Defendant also argues that "the warrantless searches and seizures of [Defendant's] property and communications after he became the focus of an investigation for a potential criminal charge not related to the security of the facility were an unconstitutional violation of his right to be free from unreasonable searched and seizures[.]" However, merely because Defendant became the focus of an investigation, does nothing to alter the fact that Defendant must first demonstrate that he had a reasonable expectation of privacy in each area he now claims a Fourth Amendment violation occurred. See, Class, 475 U.S. at 112.

To the extent Defendant argues that the "Minnesota Patient's Bill of Rights is a declaration of the understandings of patients' retention of civil liberties that are recognized and permitted by society and is a source of a reasonable expectation of privacy," that Court finds that argument unpersuasive. (See, Def.'s Mem., [Docket No. 36], at 7). Despite Defendant's ostensible assertion to the contrary, nothing in the Minnesota Patient's Bill of Rights serves as a "declaration" that Defendant retains all civil liberties that are "recognized and permitted by society" nor does anything in the Patient's Bill of Rights serve as a "source of a reasonable expectation of privacy." See, Duwenhoegger v. King, No. 10-cv-3965 (PJS/JSM), 2013 WL 646235, at *29 (D. Minn. Jan. 28, 2013), report and recommendation adopted, 2013 WL 646317 (D. Minn. Feb. 21, 2013), aff'd, 561 Fed. App'x 581 (8th Cir. 2014). The Eighth Circuit Court of Appeals has clearly and repeatedly stated that the Fourth Amendment rights of those involuntarily civilly committed are diminished in scope. Arnzen, 713 F.3d at 372–73; Beaulieu, 690 F.3d at 1028; Serna, 567 F.3d at 948–49.

Instead, in support of his argument, Defendant relies on a slip opinion in <u>State of Minnesota v. Daniels</u>, 27-cr-07-26121 (Henn. Co. Dec. 2, 2008).[12] In addition to the non-controlling nature of <u>Daniels</u>, the Court also finds the holdings contained therein unpersuasive.

<u>Daniels</u> involved a criminal defendant who was involuntarily civilly committed to the MSOP, and who challenged the search of his mail after he became the subject of a criminal investigation. <u>Id.</u> at 8–11. After noting that defendant was at the MSOP for treatment as opposed to punishment, the <u>Daniels</u> court further noted that "while he is subject to reduced expectations of privacy, those reductions must be limited in scope and purpose to the patient bill of rights." <u>Id.</u> at 13. The court in <u>Daniels</u> asserted that while correctional institutions are permitted to conduct searches without a warrant or probable cause when necessary to maintain security, "under the statutory Patient Bill of Rights a patient's rights "may be limited only as necessary to maintain a therapeutic environment of [sic] the security of the facility or to protect the safety and well being of patients, staff, and the public." (<u>Id.</u> at 13) (citing M.S.A. 235B.185 Subd. 7). The court in <u>Daniels</u> also stated that in the case then before it the "chief concern" with the mail at issue "was its effect on [defendant's] therapy, and even in that case it was not retained by the facility." <u>Id.</u> Then, without any deference to the institution, legal citation, nor discussion, the <u>Daniels</u> court implicitly decides that the return of the mail to defendant meant that the mail could not have been counter to therapeutic goals. <u>See</u>, <u>Id.</u> This is, however, contrary to caselaw instructing courts to defer to the judgement of institutions in matters of security and therapy unless the record contains policies that are unnecessary or unjustified responses to institutional issues. <u>Beaulieu</u>, 690 F.3d 1017, 1028–29; <u>see</u>, <u>Florence v. Bd. of Chosen Freeholders of Cty. of Burlington</u>, 556 U.S. 318, 322–23 (2012).

---

[12] Defendant filed a copy of this case with the Court contemporaneously with his Motion to Suppress, [Docket No. 24]. (Exhibit [Docket No. 24–1]).

The <u>Daniels</u> court opined that after defendant "became the focus of an investigation into a separate criminal charge[,]" if institution investigators "were legitimately concerned that evidence" existed to demonstrate a criminal charge, "they easily could have obtained a search warrant to look further into the financial records received in the mail." <u>State of Minnesota v. Daniels</u>, 27-cr-07-26121, at 13–14 (Henn. Co. Dec. 2, 2008). The <u>Daniels</u> court thus concluded that, without a warrant, defendants "right to a reasonable expectation of privacy as a patient and not an inmate at MSOP-ML, was unlawfully violated when the investigators continued to collect information on his financial condition after it was determined not to be contraband in the facility." <u>Id.</u> at 14.

This Court can find no other court which has interpreted the Patient's Bill of Rights in the same manner as the <u>Daniels</u> court, nor has any other court been found which has so strictly construe the measures necessary to maintain the security of a facility based upon a civilly committed person being the "focus" of a potential criminal investigation inside that facility. This Court finds such narrow and strict reasoning in the present context unpersuasive.

Accordingly, Defendant must demonstrate that he had an objectively reasonable expectation of privacy in each area he now claims a Fourth Amendment violation occurred.[13]

The Court first discusses Defendant broad expectation of privacy in his phone calls, mail, internal MSOP computer network, and room. At the outset, persons involuntarily civilly committed to the MSOP, like the Defendant, share the same diminished Fourth Amendment rights as pretrial detainees. <u>Beaulieu v. Ludeman</u>, 690 F.3d 1017, 1028 (8th Cir. 2012).

---

[13] The parties in the present case stipulated that had Defendant testified at the motions hearing, he would have testified that he had a subjective expectation of privacy in his phone calls, mail, computer network, bank account, financial information, and personal property while at the Minnesota Sex Offender Program Moose Lake facility. (October 5, 2017, Motions Hearing, Digital Recording at 11:27–11: 28 a m.). Thus, the remaining inquiry for purposes of the present motion is whether those expectations were objectively reasonable.

For example, upon the admittance of pretrial detainees into holding areas with other detainees, the United States Supreme Court has held it is a reasonable balance between intimate privacy and the needs of the institution such that law enforcement may—without any suspicion that the particular pretrial detainee is dangerous or concealing a weapon, drugs, or other contraband—require a pretrial detainee to "shower with a delousing agent" in the nude while an officer observes you lift your tongue, hold out your arms, turn around, cough while squatting, and lift your genitals. Florence v. Board of Chosen Freeholders of County of Burlington, 556 U.S. 318, 323–38 (2012). In the present case, both SI Murphy and Security Director Steven Sayovitz testified that the MSOP faces issues of contraband and violence similar to those described in Florence, and they both testified that the policy allowing for the searches of clients' phone calls, mail, internal computer networks, and rooms were for the safety and security of the MSOP, as well as, the treatment of MSOP clients. (October 5, 2017, Motions Hearing, Digital Recording at 11:36–11:37 a.m., 11:50–11:54 a.m., 12:06–12:08 p.m., 12:16–12:18 p.m., 1:14 p.m.–1:16 p.m., 1:52–1:54 p.m., 2:02–2:03 p.m.). Moreover, both SI Murphy and SD Sayovitz provided concrete examples of these safety concerns at the MSOP. (Id.). Arguably, the MSOP has an even higher concern as they, unlike the institutions discussed by the Supreme Court, are charged as well with the treatment of clients at the MSOP. (Id.).

Even more recently, the United States Supreme Court, again regarding pretrial detainees, has held upon booking of a pretrial detainee that law enforcement may insert a buccal swab into a person's mouth to extract their DNA. Maryland v. King, 569 U.S. 435, 133 S.Ct. 1958, 1980 (2013). If the objectively reasonable expectation of pretrial detainees does not render the collection of one's DNA (the most private of things one can possess) "a significant invasion of privacy that would render the DNA identification impermissible under the Fourth Amendment,"

13

then any subjective expectation of privacy the Defendant may have in his phone calls, mail, internal computer network, or room within the MSOP likewise may not equate to an objectively reasonable expectation of privacy society is prepared to recognize.

### 1. Phone Calls

Defendant argues that the searches or monitoring of his phone calls after he became the focus of suspected criminal activity violated his Fourth Amendment rights. Therefore, as discussed above Defendant must demonstrate that he had an objectively reasonable expectation of privacy in those phone calls.

Upon his commitment to the MSOP, Defendant was presented with a Minnesota Sex Offender Program Monitoring Notice form. (Gov't Ex. 1).[14] That Monitoring Notice form provides that "[i]n order to protect the public and enhance the safety and security of patients and staff at Minnesota Sex Offender Program facilities, all patient phone calls both incoming and outgoing are subject to monitoring." (Id.). It further provides that "[p]atients will be allowed to have unmonitored communications with their attorneys or other authorized persons according to policy." (Id.). Defendant signed and acknowledged that Monitoring Notice form on January 6, 2009. (Id.).

SI Murphy monitored a number of calls over the course of his investigation which Defendant placed to third parties. (October 5, 2017, Motions Hearing, Digital Recording at 11:37–11:39 a.m., 12:41–12:46 p.m.). SI Murphy testified that Defendant placed those calls under his own phone call account, as well as, under the phone call accounts of other MSOP clients. (Id. at 11:58–12:00 p.m.). SI Murphy also testified that at the beginning of each call Defendant—or any client—places a recording is played once again informing the client that the

---

[14] Government's Exhibit 1 is a copy of the Monitoring Notice which Defendant signed upon intake to the MSOP on January 6, 2009. (Gov't Ex. 1). At the motions hearing, the Government, without objection, offered the Notice as Government's Exhibit 1. (October 5, 2017, Motions Hearing, Digital Recording at 11:54–11:56 a.m.).

call was being recorded and monitored. (Id. at 11:54–11:56 a.m.). SI Murphy further testified

that clients place the calls from a collection of phones known as the phone bank which is located

in the commons area of each living unit. (Id. at 11:56–12:00 p.m.). SI Murphy testified that as

the commons area is a public area other clients are permitted to walk up to the phone bank while

a client is making a phone call. (Id.).

Given the facts and circumstances of the present case, the Court finds that Defendant had

no objectively reasonable expectation of privacy in his non-legal phone calls made from the

MSOP. The Government provided unrefuted evidence that upon intake to the MSOP Defendant

signed and acknowledged a Monitoring Notice form informing him that "all patient phone calls

both incoming and outgoing are subject to monitoring." Additionally, SI Murphy provided

unrefuted testimony that upon placement of each and every call by Defendant a recording was

played that again notified him that his calls were being recorded and monitored. Further,

Defendant placed the calls in a public area where any client or member of the MSOP staff could

listen to his call by merely walking near the public phone bank.

When a public institution, such as the MSOP, "gives advance notice to detainees that

their activity may be monitored or accessed, there is no unconstitutional deprivation of privacy."

Pyron v. Ludeman, No. 10-cv-3759 (PJS/JJG), 2011 WL 3293523, at *6 (D. Minn. June 6, 2011)

(discussing in the civil complaint context the privacy accorded to the MSOP internal computer

network under the Fourth Amendment, report and recommendation adopted, 2011 WL 3290365

(D. Minn. July 29, 2011), aff'd sub nom., Hollie v. Ludeman, 450 Fed. App'x 555 (8th Cir.

2012); see, United States v. Eggleston, 165 F.3d 624, 626 (8th Cir. 1999). Likewise, in the

present case, it would be unreasonable to have an expectation of privacy in a phone call which

you were repeatedly informed would be recorded and monitored, including being told the same

each and every time you placed a call. Defendant has no objectively reasonable expectation of privacy in those calls. See, United States v. Eggleston, 165 F.3d 624, 626 (8th Cir. 1999) (discussing calls made by a pretrial detainee and holding that "[i]f someone agrees that the police may listen to his conversation and may record them, all reasonable expectation of privacy is lost, and there is no legitimate reason to think that the recordings, like any other evidence lawfully discovered, would not be admissible"); Pyron, 2011 WL 3293523, at *6 (citing United States v. Friedman, 300 F.3d 111, 123 (2d Cir. 2002) (addressing under the Fourth Amendment the privacy rights of pretrial detainees whose telephone calls were randomly monitored and concluding that no constitutional violation occurred because the facility provided advance notice that telephone activity may be monitored)).

Moreover, the Eighth Circuit Court of Appeals has previously evaluated the telephone policy at the MSOP, including the monitoring of phone calls, and determined that "the MSOP telephone policy does not violate the Patients' constitutional rights." Beaulieu v. Ludeman, 690 F.3d 1017, 1039 (8th Cir. 2012). The Court specifically noted that "monitoring [non-legal] telephone calls and prohibiting incoming calls is reasonably related to [the] MSOP's security interest in detecting and preventing crimes and maintaining a safe environment." Id. at 1039–40 (alterations in original) (quoting Semler v. Ludeman, No. CIV 09-0732 ADMSRN, 2010 WL 145275, at *16 (D. Minn. Jan. 8, 2010)).

### 2. Mail

Defendant next argues that the searches or monitoring of his mail after he became the focus of suspected of criminal activity violated his Fourth Amendment rights. However, as noted above, the Court must first determine whether Defendant can claim an objectively reasonable expectation of privacy in his mail that has been invaded by government action. Smith v.

Maryland, 442 U.S. 735, 740 (1979); see, United States v. Bach, 310 F.3d 1063, 1066 (8th Cir. 2002) ("If there is no legitimate expectation of privacy, then there can be no Fourth Amendment violation.").

SI Murphy testified that staff at the MSOP opens all mail, except legal mail, entering the MSOP to view it. (October 5, 2017, Motions Hearing, Digital Recording at 12:19–12:20 p.m.). After it is opened, each piece of mail is then forwarded to the client. If the mailroom staff finds anything it deems suspicious in the mail, the staff member calls the office of special investigations at the MSOP. (Id. at 12:19–12:21 p.m.). An investigator in the office of special investigations can also request that the mailroom staff search and read a specific clients incoming and outgoing mail. (Id. at 12:20–12:24 p.m.). In the present case, SI Murphy received permission to have the mailroom staff monitor and read Defendant's mail from approximately April 2013, going forward. (Id. at 12:20–12:24 p.m.).

Given the facts and circumstances of the present case, the Court finds that Defendant had no reasonably objective expectation of privacy in his non-legal mail coming into or going out of the MSOP. Defendant has provided no evidence demonstrating that he had an objectively reasonable expectation of privacy in his mail. Moreover, SI Murphy provided unrefuted testimony that every piece of mail entering the MSOP, except legal mail, was opened for inspection before delivery to the clients. (Id. at 12:19–12:21 p.m.). Therefore, Defendant had obviously regularly received his non-legal mail already opened and inspected.

Moreover, the internal computer network, to which Defendant clearly had access, contains the MSOP policy regarding client mail which states that "MSOP staff will inspect all incoming and outgoing mail except for mail to and/or from the Office of Special Investigations (OSI), Legal Services, MSOP facility directors, facility clinical directors, the MSOP Executive

Directors and the MSOP Executive Clinical Director." (Gov't's Ex. 4).[15] Additionally, MSOP Security Director Steven Sayovitz provided unrefuted testimony that each MSOP policy is posted onto the client internal computer network for review before implementation each year, and thereafter, every MSOP client policy remained available on the internal computer network. As the record clearly indicates, Defendant had access to the internal computer network, and Defendant has not asserted in any way how this policy notice was inadequate to inform him that his non-legal mail was subject to monitoring. See, Pyron, 2011 WL 3293523, at *6.

Accordingly, it would be unreasonable for Defendant to have an objective expectation of privacy in the non-legal mail presently at issue when all non-legal mail he had previously received was opened and the MSOP Client Mail policy, informing him that the all such mail was inspected, was available to him on the internal computer network.

Similarly, another Court in this District has stated that the MSOP policy of opening and reviewing all non-privileged mail did not offend the constitution because the "MSOP has a legitimate interest in maintaining the safety or its staff and patients and the rehabilitation of its patients" and therefore, the MSOP mail policy does not violate clients' First Amendment rights. See, in accord, Semler v. Ludeman, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *11 (D. Minn. Jan. 8, 2010).

Moreover, the Court notes that in previous litigation involving this same Defendant another Court in this District held that the MSOP "had a permissible purpose to search [Defendant's] mail for contraband." Senty-Haugen v. Goodno, No. 4-cv-1077 (ADM/JJG), 2005 WL 2917464, at *9 (D. Minn. Nov. 4, 2005), aff'd 462 F.3d 876 (8th Cir. 2006) (citing Powells v. Minnehahah County Sheriff Dep't, 198 F.3d 711, 712 (8th Cir. 1999). In that previous civil

---

[15] Government's Exhibit 4 is a copy of the MSOP Client Mail policy. (Gov't Ex. 4). At the motions hearing, the Government, without objection, offered the Client Mail policy as Government's Exhibit 4. (October 5, 2017, Motions Hearing, Digital Recording at 1:54–1:56 p.m.).

suit, Defendant alleged that the MSOP staff was "interfer[ing] with his ability to communicate with his lawyer by repeatedly opening, scanning, and reading his outgoing and incoming legal mail." Id. The Court held that even if the allegation was true, the staff at the MSOP "had a permissible purpose to search [Defendant's] mail for contraband." Id. It is hard to imagine how Defendant could possess an objectively reasonable expectation of privacy in his non-legal mail now at issue when a Court in this District had already informed him that the MSOP has a permissible purpose to search his mail.[16]

### 3.    Internal MSOP Computer Network

Defendant further argues that the searches and monitoring of his internal MSOP computer network use after he became the focus of suspected criminal activity violated his Fourth Amendment rights. Therefore, as discussed above, Defendant must demonstrate that he had an objectively reasonable expectation of privacy in his internal computer network use.

SI Murphy acquired a copy of Defendant's internal computer network materials during the course of his investigation. (October 5, 2017, Motions Hearing, Digital Recording at 12:03–12:08 p.m.). The copy of Defendant's internal computer network contained everything which Defendant had saved on the computer network, however, SI Murphy was only provided screenshots of the materials the MSOP technician found relevant to SI Murphy's limited request. (Id.).

SI Murphy testified that each time a client logs into his internal computer network account a warning is displayed informing the client that the computer network is monitored by the MSOP. (Id. at 12:07–12:10 p.m.). The warning displayed upon client log-in provides that

---

[16] The Court notes that the record of Defendant's prior litigation demonstrates that Defendant received the Order informing him of the MSOP staff's permissible purpose to search his mail because Defendant appealed that Order to the Eighth Circuit Court of Appeals. See, Senty-Haugen v. Goodno, No. 4-cv-1077 (ADM/JJG), [Docket No. 72]. The Eighth Circuit Court of Appeals later affirmed the District Court's Order. Senty-Haugen v. Goodno, No. 6-cv-1086 (8th Cir. Sept. 11, 2006).

"ANY ACTIVITY ON THIS SYSTEM MAY BE MONITORED OR ACCESSED BY THE STATE OF MINNESOTA OR OTHER AUTHORIZED OFFICIALS AT ANY TIME. THIS INCLUDES ANY DATA CREATED OR STORED USING THIS SYSTEM. ANY IDENTIFIED EVIDENCE OF POSSIBLE CRIMINAL ACTIVITY WILL BE PROVIDED TO APPROPRIATE LAW ENFORCEMENT AGENCIES." (Gov't Ex. 2).[17] The warning further provides that all of the computers are state owned. (Id.). SI Murphy also testified that the computers are located in a cubicle with a bank of four to six computers (depending on the unit) in a public area where anyone is permitted to walk. (October 5, 2017, Motions Hearing, Digital Recording at 12:00–12:02 p.m.).

Given the facts and circumstances of the present case, the Court finds that Defendant had no reasonably objective expectation of privacy in his internal computer network use on the MSOP owned computer. SI Murphy provided unrefuted testimony that each and every time Defendant logged into the internal computer network he was notified that the network was monitored including anything he saved on the network, and he was notified that any evidence of possible criminal activity would be provided to law enforcement. Additionally, Defendant used the internal computer network in a public area where any client or member of the MSOP staff could observe the computer screen by simply walking near the public bank of computers.

When an institution, such as the MSOP, "gives advance notice to detainees that their activity may be monitored or accessed, there is no unconstitutional deprivation of privacy." Pyron v. Ludeman, No. 10-cv-3759 (PJS/JJG), 2011 WL 3293523, at *6 (D. Minn. June 6, 2011) (discussing—in the civil complaint context—the privacy accorded to the MSOP computer network under the Fourth Amendment), report and recommendation adopted, 2011 WL 3290365

---

[17] Government's Exhibit 2 is a screenshot copy of the warning displayed upon client log in. (Gov't Ex. 2). At the motions hearing, the Government, without objection, offered the screenshot as Government's Exhibit 2. (October 5, 2017, Motions Hearing, Digital Recording at 12:08–12:09 p.m.).

(D. Minn. July 29, 2011), aff'd sub nom., Hollie v. Ludeman, 450 Fed. App'x 555 (8th Cir. 2012); see, United States v. Eggleston, 165 F.3d 624, 626 (8th Cir. 1999). As noted above, the Eighth Circuit Court of Appeals has determined that pretrial detainees lack privacy in a phone call after being repeatedly warned that the calls would be monitored and recorded. This Court finds no difference, in this context, between the monitoring of those phone calls and of an internal computer network provided to clients at the MSOP on state owned computers. Other Courts have reached similar conclusions regarding the privacy afforded to the computers at the MSOP. See, e.g., Pyron, 2011 WL 3293523.

In the present case, it would be unreasonable to have any expectation of privacy in an internal computer network after being repeatedly informed that it was monitored, including being told this each and every time the user logged onto the computer network. See, Pyron, 2011 WL 3293523, at *6; Cf., Eggleston, 165 F.3d at 626 ("If someone agrees that the police may listen to his conversation and may record them, all reasonable expectation of privacy is lost, and there is no legitimate reason to think that the recordings, like any other evidence lawfully discovered, would not be admissible"). Defendant has no objectively reasonable expectation of privacy in the internal MSOP computer network.

### 4. Room Searches

Defendant lastly argues that the search of his room in April 2013, after he became the focus of suspected criminal activity violated his Fourth Amendment rights. Therefore, as discussed above Defendant must demonstrate that he had an objectively reasonable expectation of privacy in his room.

However, in discussing the Fourth Amendment rights of individuals civilly committed in the Iowa Civil Commitment Unit for Sex Offenders, the Eighth Circuit Court of Appeals noted

while it had not previously outlined the expectation of privacy of a civil committee, it had held that "detainees do not have a reasonable expectation of privacy in their jail cells." Arnzen, 713 F.3d at 373 (citing United States v. Hogan, 539 F.3d 916, 923 (8th Cir. 2008)). In that same breath, the Eighth Circuit Court of Appeals reemphasized the long held precedent that a civil committee's expectation of privacy is the same as that of a pretrial detainee, and both are of a diminished scope. Id. Given this Eighth Circuit precedent, this Court finds no reasons why the standard applicable to a pretrial detainee's expectation of privacy would differ from that of a MSOP civil committee, such as Defendant. Other Courts have reached similar conclusions under similar circumstances. See, e.g., Serna v. Goodno, 567 F.3d 944, 948–50 (8th Cir. 2009) (discussing the similarities between involuntarily committee persons and pretrial detains and holding that the same standards regarding the Fourth Amendment should apply to both groups of persons).

Moreover, in Bell v. Wolfish, 441 U.S. at 56–57, the United States Supreme Court upheld the constitutionality of unannounced, warrantless room searches in a facility housing pretrial detainees reasoning that "[i]t is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure . . . ." When coupled with the fact that the Eighth Circuit has repeatedly held that involuntarily civilly committed persons retain the Fourth Amendment rights to be free from unreasonable searches, analogous to the rights retained by pretrial detainees, see, e.g., Serna v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009), this Court sees no reason that the rational in Bell would not apply to the present case with equal force. See, also, Houseman v. Jesson, No. 15-cv-2209 (PAM/HB), 2016 WL 7231600, at *3 (D. Minn. Dec. 14, 2016); Evenstad v. Herberg, 994 F. Supp. 2d 995, 1002 (D. Minn. 2014); Daniels v. Jesson, No. 13-cv-736 (JNE/SER), 2014 WL

3629874, at *6 (D. Minn. July 22, 2014); <u>Duwenhoegger v. King</u>, No. 10-cv-3965 (PJS/JSM), 2013 WL 646235, at *29 (D. Minn. Jan. 28, 2013), <u>report and recommendation adopted,</u> 2013 WL 646317 (D. Minn. Feb. 21, 2013), <u>aff'd,</u> 561 Fed. App'x 581 (8th Cir. 2014); <u>Beaulieu v. Ludeman</u>, No. 7-cv-1535 (DWF/JSM), 2011 WL 13187190, at *9 (D. Minn. Feb. 15, 2011), <u>report and recommendation adopted,</u> 2011 WL 13187191 (D. Minn. Mar. 31, 2011), <u>aff'd,</u> 690 F.3d 1017 (8th Cir. 2012).

Accordingly, pursuant to established Eighth Circuit and United States Supreme Court precedent, Defendant has no objectively reasonable expectation of privacy in his room at the MSOP. Therefore, he cannot claim any Fourth Amendment violation deriving from any search of that room. <u>See</u>, <u>Kyllo v. United States</u>, 533 U.S. 27, 31–33 (2001); <u>New York v. Class</u>, 475 U.S. 106, 112 (1986).

For the foregoing reasons, the Court recommends **DENYING** Defendant's Motion to Suppress. [Docket No. 24].

## III. DEFENDANT'S MOTION FOR PERMISSON TO FILE DOCUMENTS. [DOCKET NO. 37].

Defendant's Motion for Permission to File Documents, [Docket No. 37], seeks an Order of this Court allowing Defendant permission to file a further document in support of his pro se argument that he was unlawfully detained at the MSOP and thus retains the rights of a private citizen. (<u>See</u>, <u>Id.</u>). As discussed above, however, the Court has already held that Defendant's pro se arguments and filings on this issue were improper. Therefore, any attempt to supplement that argument is moot.

Accordingly, Defendant's Motion for Permission to File Documents, [Docket No. 37], is **DENIED as moot**.

**IV.    GOVERNMENT'S MOTION TO STRIKE PRO SE FILINGS. [DOCKET NO. 38].**

The Government's Motion to Strike Pro Se Filings, [Docket No. 38], seeks an Order of this Court striking Defendant's pro se filings in the present case and denying Defendant's Motion for Permission to File Documents. [Docket No. 37]. As discussed above, however, the Court has already held that Defendant's pro se arguments and filings were improper, and the Court has further determined that Defendant's Motion for Permission to File Documents, [Docket No. 37], is moot.

Accordingly, the Government's Motion to Strike Pro Se Filings, [Docket No. 38], is **DENIED as moot**.

**V.    CONCLUSION**

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.   Defendant's Motion to Suppress, [Docket No. 24], be **DENIED.**

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.   Defendant's Motion for Leave to File Additional Document, [Docket No. 37], is **DENIED as moot**; and

2.   The Government's Motion to Strike Pro Se Filings, [Docket No. 38], is **DENEID as moot**.

Dated: November 21, 2017                              s/Leo I. Brisbois
                                                      Leo I. Brisbois
                                                      U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.